# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 5:21-cr-885 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| JARED METZGER, | ) | |
| | ) | |
| | ) | |
| DEFENDANT. | ) | |

Now before the Court is the motion of defendant Jared Metzger ("Metzger") to suppress all evidence derived from the search of a cell phone obtained through the execution of a search warrant on March 1, 2021. (Doc. No. 21 (Motion).) Plaintiff United States of America (the "government") opposes the motion. (Doc. No. 23 (Response).)

Metzger initially requested an oral hearing on the motion. (Doc. No. 21 at 1[1].) In a telephonic conference on August 2, 2022, counsel agreed that a hearing was unnecessary because the motion presents strictly legal arguments that must be resolved by an examination of the four corners of the affidavit supporting the search warrant. (Minute Order, 8/2/2022.) *United States v. Goodwin*, 552 F. App'x 541, 548 (6th Cir. 2014) ("An evidentiary hearing is required only when the defendant has set forth contested issues of fact that bear upon the legality of the search.") (quotation marks and citation omitted); *see United States v. Moore*, 999 F.3d 993, 996 (6th Cir. 2021) (probable cause is determined upon an examination of the "four corners" of the supporting

_____

[1] All page number references herein are to the consecutive page numbers applied to each individual document by the Court's electronic docketing system.

affidavit).

For the reasons that follow, the motion to suppress is DENIED.

## I.  BACKGROUND

The search in question was executed pursuant to a warrant issued by a judge of the Chardon Municipal Court of Geauga County, Ohio. (Doc. No. 22-1 (Search Warrant).) The search warrant, in turn, was supported by an affidavit sworn by Detective Andrew R. Humar of the Geauga County Sheriff's Office. (Doc. No. 22 (Affidavit).) Detective Humar, a law enforcement officer with twenty-two years of service, averred that over the course of his career he has received specialized training and has gained experience in investigating "large-scale Drug Trafficking Organizations (DTO)." (*Id*. at 1.) Since 2014, the primary focus of his duties has been the investigation of drug trafficking and associated drug offenses. (*Id*.)

The remainder of the fourteen-page affidavit detailed a nine month investigation into a suspected DTO operated by Devin M. McFaul in Geauga County, Ohio. Specifically, the affidavit outlined and described the various investigatory techniques employed by law enforcement—such as surveillance, trash pulls, interviews, traffic stops, controlled buys, field drug tests, and social media searches—before seeking the warrant at issue herein. For example, the affidavit recounted discussions with confidential informants and other citizens identifying McFaul as a known methamphetamine supplier in the Chardon area. (*Id*. ¶¶ 3, 5, 7, 22, 34.) The affidavit also described multiple trash pulls from residences associated with McFaul. (*Id*. ¶¶ 11–13, 16, 21, 30.) These trash pulls yielded evidence commonly associated with drug trafficking, including hypodermic syringes, small narcotics baggies with white powder residue, latex gloves, a digital scale, and other drug paraphernalia. (*Id*.)

2

The affidavit also recorded several instances where electronic surveillance of McFaul captured what officers believed were drug runs. In paragraph ¶ 32, the affidavit described one such run as follows:

> That on February 16, 2021, McFaul traveled from his known residence at ___[2] to ___, remaining at the residence for only (1) minutes time. Utilizing the Chevy truck, McFaul then traveled directly to the area of Belvoir Center Apartments. Sgt. Skok of the Cleveland Heights Police Department was conducting plain clothes surveillance in the area. Sgt. Skok observed McFaul's vehicle enter the parking lot and park near the far corner of the parking lot. The vehicle was occupied by two Caucasian males. Sgt. Skok observed a male, matching McFaul's description, meet with a white Mercedes [station wagon] (Oh Reg: ____). Following the brief meeting, both vehicles vacated the parking lot. McFaul then traveled directly back to his known residence at ___. McFaul stayed at the residence for approximately (35) minutes before traveling back to ___.
>
> a. Based on the investigation to date, this "run" was identified as a likely narcotics run; wherein McFaul is actively bringing unknown narcotics back into Geauga County for resale.

(*Id*. ¶ 32.) In all, the affidavit described more than ten similar drug runs executed by McFaul during the investigatory period. (*Id*. ¶¶ 14–15, 26–27, 35, 38, 43.)

Additionally, the affidavit linked Metzger to McFaul's drug trafficking activities. Paragraph 18 provides:

> That on January 15, 2021, Detectives were conducting stationary surveillance at ___, the known residence of Devin McFaul. Detectives observed a red Chevy Camaro with an invalid registration (Homemade Plate: PRIV4T3) parked in the driveway of the residence. Detectives identified the vehicle as a vehicle of interest in a separate criminal investigation. A male exited the residence and vacated the property, driving away in the Chevy, Camaro. Detectives conducted a traffic stop on the Camaro and identified the operator as Jared Metzger, a known subject with multiple law enforcement contacts. Metzger possessed an active warrant for his arrest, whereas he was taken into custody. A search of Metzger's person revealed a plastic baggy of apparent THC wax/oil. Metzger confirmed it was THC wax, which is a marijuana concentrate product.

---

[2] Throughout this opinion, underlining denotes where portions of the warrant affidavit were redacted to remove certain addresses. An unredacted version of the warrant affidavit appears on the docket at Doc. No. 21-1 [sealed].

    a.   That while transporting Metzger to the Geauga County Jail, Metzger informed Sgt. Bilicic that he knew he was stopped because he left McFaul's residence; insinuating knowledge of law enforcement surveillance.

    b.   Detectives then learned that Metzger had alerted McFaul to the investigation by tagging him in a Facebook post on January 17, 2021, about legal rulings from the state of New York and also mentioning Sgt. Bilic (though he spelled his name wrong).

(*Id.* ¶ 18, with screen shot of Facebook post reproduced therein.) In the paragraphs that followed, the affiant recounted how McFaul began using different vehicles to facilitate his drug trafficking activities, and how the vehicle he had primarily relied on prior to Metzger's social media post—a Chevy truck—was parked undisturbed in his driveway until January 29, 2021. (*Id.* ¶¶ 19–20, 23–25.) Detective Humar averred:

> That based on this affiant's training and experience, it is believed that Metzger's [Facebook] notification to McFaul was a direct causation of McFaul switching from the original target vehicle (Chevy Truck) to the now identified Chevy Cruze.

(*Id.* ¶ 25.)

A month later, law enforcement had another opportunity to conduct a traffic stop of Metzger in connection with the McFaul DTO investigation. Paragraph 41 provides, in relevant part:

> On February 28, 2021, deputies observed Jared Metzger operating McFaul's Subaru station wagon. Deputies conducted a traffic stop on the vehicle because Metzger had a felony warrant for his arrest. During the stop, K9 Spirit alerted to the presence of narcotics in the vehicle. During a brief search of the vehicle, deputies located a hand-written document, appearing to be a drug ledger, which totaled $1,600 for collection and multiple different names associated to dollar amounts. The vehicle was impounded, and deputies will be obtaining a warrant to conduct a more thorough search, as a tip received in November of 2020 from Victoria Dambrosia stated that McFaul was bragging about the vehicle containing a hidden compartment where he stores drugs that the police have been unable to locate.

4

(*Id*. ¶ 41.)

Finally, in a voluntary interview with a witness on February 19, 2021, the witness informed

law enforcement that she had purchased methamphetamines from McFaul's apartment on multiple

occasions, and that she had seen McFaul with AR-15 style rifles and large quantities of controlled

substances in the apartment. (*Id*. ¶ 34.) Based upon her visits to the apartment, she was aware that

"Jared Metzger, a subject with an active felony warrant, was also residing in that apartment full

time." (*Id*. ¶ 34(b).)

The affidavit sought permission to search three known residences associated with McFaul

and his alleged DTO. It also requested the seizure of all controlled substances, U.S. currency,

packaging materials, scales, drug paraphernalia, ATM receipts, personal papers, firearms,

lockboxes or safes, and cell phones (and their contents including contacts, call history, text

messages, emails, voicemails, pictures, videos, and applications and their contents). (*Id*. at 13–14.)

As justification for the search and seizure of cell phones, the affidavit further provided:

> Based upon his training and experience, this Affiant knows that those engaged in
> drug trafficking often use cellular telephones to schedule transactions and get
> directions to the locations of buys. The following information located on the cell
> phone is relevant to drug trafficking investigations: contacts, call history, text
> messages, emails, voicemails, pictures, videos, and applications and their contents
> (such as Google Maps).

(*Id*. ¶ 42.)

The search warrant was signed on March 1, 2021 and executed the same day. From the

Center Street apartment, officers found suspected cocaine, a digital scale, a bag of suspected

mushrooms, and drug paraphernalia. (Doc. No. 21-3 (Cell Phone Affidavit, Mar. 19, 2021) ¶ 2(a).)

In the Subaru station wagon, officers located a pill bottle with white residue and a suspected drug

ledger. (*Id*. ¶ 3(a).) Detectives also seized several phones and tablets during the execution of the warrant, including a Samsung Galaxy Note 4, Model Number SM-N910T3, with Serial Number RF8GB2XT95N, which has found near personal notes and property belonging to Metzger. (*Id*. ¶ 2(a).) Additionally, a separate Samsung Galaxy Note 8, Model Number: SM-N950U with a cracked screen and duct tape on the back cover was found with Metzger's ID attached to it inside the Subaru. (*Id*. ¶ 3(a).) These two phones were in addition to a third phone, a Black Motorola Trac Phone previously found on Metzger's person during the February 28th traffic stop.[3] (Doc. No. 23-1 (Inventory/Receipt Attachment).) One of the seized phones contained a text message recounting how Metzger intended to use the Subaru to pick up money to purchase one half-ounce of narcotics.

While analyzing the Samsung Galaxy Note 4 phone found at the Center Street apartment, an investigator for the Geauga County Prosecutor's Officer located an image that was consistent with child sexual abuse stored in the browser cache. The investigator ceased the cellular analysis of the phone in order to obtain another search warrant to authorize analysis of the seized devices for suspected child sexual abuse material. (Doc. No. 1-1 (Complaint Affidavit); Doc. No. 21-3 ¶ 5.)

On December 16, 2021, a grand jury sitting in the Northern District of Ohio returned a two-count indictment charging Metzger with receipt and distribution of visual depictions of real minors engaged in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(2); and possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B). (Doc. No. 12 (Indictment).) A jury trial is currently set to begin on September 26, 2022, on a one-week standby basis. (Doc. No. 20

---

[3] At least two other cellular phones, a Huawei cell phone Model H892L with Serial Number Z7QDU15921003275 and a black TCL were also found during the execution of the warrant. (Doc. No. 23-1.)

(Ends of Justice Order).)

## II.    LAW AND DISCUSSION

The Fourth Amendment mandates that there must be probable cause for any search and seizure. U.S. Const. Amend. IV. "Probable cause has been defined as 'reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.'" *United States v. Padro,* 52 F.3d 120, 122–23 (6th Cir. 1995) (quoting *United States v. Bennett,* 905 F.2d 931, 934 (6th Cir. 1990)). "To demonstrate probable cause to justify the issuance of a search warrant, an affidavit must contain facts that indicate a fair probability that evidence of a crime will be located on the premises of the proposed search." *United States v. Frazier,* 423 F.3d 526, 531 (6th Cir. 2005) (internal quotation marks and citation omitted). "Probable cause is based on the totality of the circumstances; it is a 'practical, non-technical concept that deals with the factual and practical considerations of everyday life.'" *United States v. Abboud,* 438 F.3d 554, 571 (6th Cir. 2006) (quoting *Frazier*, 423 F.3d at 531).

"With great deference toward the issuing judge's determination, federal courts examine the affidavit's four corners to determine whether, under the totality of the circumstances, the low bar of probable cause has been overcome." *United States v. Moore*, 999 F.3d 993, 996 (6th Cir. 2021) (citations omitted); *see Whiteley v. Warden,* 401 U.S. 560, 565 n.8, 91 S. Ct. 1031, 28 L. Ed. 2d 306 (1971); *Aguilar v. Texas,* 378 U.S. 108, 109 n.1, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964), *abrogated on other grounds by Illinois v. Gates,* 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983). The affidavit is "judged on the adequacy of what it does contain, not on what it lacks, or what a critic might say should have been added." *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000).

Even if probable cause is lacking to support the issuance of a search warrant, a search may still be upheld under the good faith exception articulated in *United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984). Under this exception, the exclusionary rule will not apply to bar the admission of evidence seized in violation of the Fourth Amendment where the officers had a "good-faith reliance on a search warrant that is subsequently held to be defective." *United States v. Weaver*, 99 F.3d 1372, 1380 (6th Cir. 1996) (quoting *Leon*, 468 U.S. at 905). The "good-faith inquiry is confined to the objectively ascertainable question of whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization. In making this determination, all of the circumstances . . . may be considered." *Leon*, 468 U.S. at 922–23 n.23.

The good-faith defense will not apply, however, where: (1) the supporting affidavit contains information the affiant knew or should have known is false; (2) the issuing magistrate lacked neutrality and detachment; (3) the affidavit is devoid of information that would support a probable cause determination making any belief that probable cause exists completely unreasonable; or (4) the warrant is facially deficient. *Leon*, 468 U.S. at 923; *United States v. Helton*, 314 F.3d 812, 824 (6th Cir. 2003) (citations omitted).

### A. Nexus Between Drug Trafficking and the Cell Phone

Metzger now seeks to suppress all evidence found in the search of his cell phone. He argues that the warrant affidavit failed to set forth probable cause to search any cellular phones. In particular, he posits that the affidavit was devoid of any evidence connecting him, or his cell phone, to drug trafficking. (Doc. No. 21 at 4–5.)

"To justify a search, the circumstances must indicate why evidence of illegal activity will

be found 'in a particular place,'" as opposed to some other place. *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc); *see United States v. Brown*, 828 F.3d 375, 381 (6th Cir. 2016). "There must, in other words, be a *nexus* between the place to be searched and the evidence sought." *Brown*, 828 F.3d at 381 (quotation marks and citation omitted, emphasis in original). The nexus requirement does not dictate that officers have unassailable, direct knowledge that evidence of illegal activity will be found in the location to be searched. Rather, as is the case with all probable cause inquires, officers need only present the issuing judge with sufficient evidence to allow for a "practical, common-sense" conclusion that "there is a fair probability that contraband or evidence of a crime will be found [at the place or thing to be searched]." *United States Washington*, 380 F.3d 236, 240 (6th Cir. 2004) (quoting *Carpenter*, 360 F.3d at 594).

The Supreme Court has made clear that a cell phone cannot be searched simply because it was seized incident to an arrest. *Riley v. California*, 573 U.S. 373, 401, 134 S. Ct. 2473, 189 L. Ed. 2d 430 (2014); *see United States v. Ramirez*, 180 F. Supp. 3d 491, 495 (W.D. Ky. 2016) ("Possessing a cell phone during one's arrest for a drug-related conspiracy is insufficient by itself to establish a nexus between the cell phone and any alleged drug activity.") Rather, like any subject of a search warrant, the supporting affidavit must establish a nexus between the cell phone and the criminal activity under investigation. *See United States v. Bass*, 785 F.3d 1043, 1049 (6th Cir. 2015) (finding that a warrant affidavit supported the search of the defendant's cell phone because the affidavit provided that the co-conspirators frequently used cell phones to communicate and defendant was using the particular cell phone in question at the time of his arrest).

Metzger likens the present affidavit to the one found deficient in *Ramirez*. There, the court held that a warrant to search a suspect's cell phone was not supported by probable cause, and also

found the good faith exception inapplicable, where the "only information in the affidavit indicating any likelihood that evidence of a crime might be found on Ramierz's phone was the fact that he was arrested for the alleged drug conspiracy while he possessed the phone." *Id*. at 495. And in fact, the Sixth Circuit has held that the fact that a defendant owned or possessed a cell phone, even when coupled with the affiant's knowledge that cell phones are often used to facilitate drug trafficking activity, falls short of establishing the proper nexus to support a search. *See United States v. Merriweather*, 728 F. App'x 498, 506 (6th Cir. 2018). "But the Sixth Circuit has also found that when the affidavit contains more—in particular, a factual basis to support a conspiracy or coordinated activity—a search of a member's cell phone is not unreasonable." *United States v. Lavallis*, 515 F. Supp. 3d 686, 691 (E.D. Mich. 2021) (citing *Merriweather*, 728 F. App'x at 506); *see United States v. Gholston*, 993 F. Supp. 2d 704, 720 (E.D. Mich. 2014) (noting that "a number of courts have found that an affidavit establishes probable cause to search a cell phone when it describes evidence of criminal activity involving multiple participants and includes the statement of a law enforcement officer, based on his training and experience, that cell phones are likely to contain evidence of communications and coordination among these multiple participants").

To be fair, the initial affidavit contains more information than what was presented in *Ramirez*. First, as outlined above, the affidavit attempts to establish Metzger's connection to the DTO under investigation. On two separate occasions during the investigation Metzger was stopped by police. The first stop occurred immediately after Metzger had left McFaul's residence, and his vehicle contained evidence of drug trafficking. (Doc. No. 22 ¶ 18.) At the time of the stop, Metzger indicated that he was aware of the drug investigation involving McFaul, and later used social media to warn McFaul thereby protecting and advancing the on-going drug trafficking activities. (*Id*.) At

10

the time of the second stop, Metzger was driving one of the vehicles known by law enforcement to be used by McFaul to facilitate his drug trafficking activities. (*Id*. ¶ 41.) The vehicle contained evidence of drug trafficking. At the time of the search, Metzger was also known to be living in a residence shared by McFaul and used for drug trafficking. (*Id*. ¶ 34(b).)

The affidavit also attempts to establish the link between the use of cell phones and the drug trafficking under investigation. Metzger's warning to McFaul on social media, which presumably was accomplished through the use of an electronic device like a cell phone or tablet, shows not only his connection to the DTO but *his own use of an electronic device to further the mission of the DTO*. Additionally, other reasonable inferences can be drawn from the facts contained in the affidavit. As previously noted, the affidavit detailed multiple drug runs where McFaul met different individuals at various locations and times to receive or distribute controlled substances. (*See, e.g*., ¶ 32.) This activity gives rise to a common sense inference that McFaul and others coordinated their actions and used their cell phones to do so. *See United States v. Griffin*, No. 2:17-cr-20639, 2022 WL 2072042, at *3 (E.D. Mich. June 8, 2022) (finding such an inference from similar facts and observing that "[c]ourts have recognized the importance of cell phones in coordinating criminal enterprises, particularly drug trafficking conspiracies") (collecting cases). An inference, the Court observes, that is bolstered in some respect by a reference in the affidavit to two drug customers who advised officers that they had attempted to contact McFaul by phone when he did not timely appear at the designated location for a scheduled drug transaction. (*See* Doc. No. 22 ¶ 9[4].)

---

[4] However, as Metzger observes, it is unclear whether the "phone" referenced in paragraph 9 referred to McFaul's cellular phone or a land line. (Doc. No. 21 at 6 n.3.)

It is Metzger's position that these inferences, even when viewed in light of the information in the affidavit, fail to establish a "fair probability" that evidence of drug trafficking would be found on Metzger's cell phone. *See United States v. Green*, 250 F.3d 471, 479 (6th Cir. 2001) ("Probable cause exists when there is a fair probability, given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place.") (quotation marks and citation omitted). But the Court need not decide this issue "because the Court finds that the [officers] acted in good faith in relying on the warrant." *See, e.g., Lavallis*, 515 F. Supp. 3d at 692–93 (distinguishing *Ramirez* but relying on *Leon* good faith to deny suppression motion).

**B.** *Leon* **Good Faith Exception**

Metzger does not suggest that the affiant supplied knowingly false information in his affidavit, nor that the magistrate lacked neutrality or proper detachment. Moreover, contrary to Metzger's position, the warrant affidavit cannot be described as so "bare bones" that a law enforcement officer would be unable to rely on it. *See United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017) ("A bare-bones affidavit is . . . 'one that states only suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge.'") (quoting *United States v. Laughton*, 409 F.3d 744, 748 (6th Cir. 2005) (additional quotation marks and citation omitted)). Indeed, a warrant affidavit can only be considered "bare bones" when there exist "no reasonable grounds for believing that the warrant was properly issued." *Id*. at 506 (quotation marks and citation omitted).

Here, the supporting affidavit was more than fourteen single-spaced pages and contained a substantial amount of detail into the underlying drug trafficking investigation, and the relevance of any information contained in cell phones to the investigation. These articulated facts established

a "minimally sufficient nexus" between the alleged drug trafficking and the electronic devices to be searched sufficient to support the executing officers' good faith belief that the warrant was valid. *See Carpenter*, 360 F.3d at 596; *see also White*, 874 F.3d at 496 ("If the reviewing court is 'able to identify in the averring officer's affidavit *some* connection, regardless of how remote it may have been'—'some modicum of evidence, however slight'—'between the criminal activity at issue and the place to be searched,' then the affidavit is not bare bones and official reliance on it is reasonable.") (quoting *Laughton*, 409 F.3d at 749–50) (emphasis in original); *see, e.g., United States v. Castro*, 881 F.3d 961, 966 (6th Cir. 2018) (upholding search, based on *Leon's* good faith, where it was not the case that a "simple glance at the warrant would [have] reveal[ed] deficiencies glaring enough to make reliance on it unreasonable") (quotation marks and citation omitted).

In this case, an executing officer's reasonable reliance on the right to search Metzger's cell phone pursuant to the warrant would have been fortified by the fact that multiple cell phones were recovered during the search. *See United States v. Gilbert*, 952 F.3d 759, 762 (6th Cir. 2020) (recognizing "numerous cell phones" as "tools of the drug-trafficking trade"); *United States v. Taylor*, 471 F. App'x 499, 516 (6th Cir. 2012) (noting that possession of ten cell phones among three people was "a telltale sign of drug dealing" and collecting cases). That the phone in question was discovered in the same apartment where officers found suspected drugs, a scale, and drug paraphernalia would have further reinforced an officer's reasonable belief that Metzger's cell phone could be searched pursuant to the warrant and the drug investigation. *See generally Gholston*, 993 F. Supp. 2d at 719–20 (collecting cases where police could infer that a cell phone discovered in relation to drug conspiracies involving multiple actors contained evidence of criminal activity); *see also Merriweather*, 728 F. App'x at 506 (noting that an affidavit established

13

probable cause to search a cell phone where the phone was alleged to have facilitated drug sales and "that the particular cell phone at issue was found in a vehicle containing apparent oxymorphone, the very drugs involved in the conspiracy"); *Lavallis*, 515 F. Supp. 3d at 692 (explaining that a "number of decisions have concluded that probable cause to search a cell phone exists simply because cell phones discovered in proximity to crime or contraband almost invariably contain incriminating evidence") (collecting cases).

Under these circumstances, even if the magistrate did not have probable cause to allow the search of the contents of the cell phones, the Court finds that excluding the evidence in this case would "not advance the core purpose of the Fourth Amendment in any appreciable way." *White*, 874 F.3d at 505 (noting that it does not deter unlawful police conduct by "[p]enalizing officers for the magistrate's error" of issuing a warrant without probable cause) (quoting *Leon*, 468 U.S. at 921). Officers clearly had reasonable grounds for relying on the warrant in searching the multiple phones recovered during the execution of a warrant that yielded other substantial evidence of drug trafficking. And while not essential to the Court's ruling, it is worth highlighting that the officer assigned to search the seized phones exercised restraint and demonstrated a willingness to stay within the bounds of the warrant. When his search of one of Metzger's phones led to the discovery of evidence that exceeded the scope of the underlying drug trafficking investigation, he prudently suspended his search until he could obtain authorization to perform the proper analysis consistent with the discovery of suspected child pornography. These are not the actions of an officer who brazenly flouts the Fourth Amendment in a reckless pursuit of criminal activity, and only serve to reinforce a finding of good faith. Because an officer would have been reasonably justified in relying on the warrant, believing in good faith that it was supported by probable cause, Metzer's

motion to suppress must be denied. *See Merriweather*, 728 F. App'x at 504–05.

**III.   CONCLUSION**

For the foregoing reasons, Metzer's motion to suppress is DENIED.

**IT  IS SO ORDERED**.

Dated: August 23, 2022

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**